**THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
CIVIL CASE NO. 1:19-cv-00087-MR
[CRIMINAL CASE NO. 2:10-cr-00009-MR]**

| | | |
|---|---|---|
| **JAMES ERNEST LESPIER,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | **MEMORANDUM OF** |
| **vs.** | ) | **DECISION AND ORDER** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Respondent.** | ) | |
| _____ | ) | |

**THIS MATTER** is before the Court on the Petitioner's Motion under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody [CV Doc. 1] and the Government's Response in Opposition to Motion to Vacate and Motion to Dismiss [CV Doc. 5].[1]

## I.    BACKGROUND

### A.    Mandi Smith's Murder

On the evening of May 17, 2010, the Petitioner James Ernest Lespier was at his home on the Cherokee Indian Reservation with the victim, Mandi

---

[1] Citations to the record herein contain the relevant document number referenced preceded by either the letters "CV" denoting that the document is listed on the docket in the civil case file number 1:19-cv-00087-MR, or the letters "CR" denoting that the document is listed on the docket in the criminal case file number 2:10-cr-00009-MR.

Smith ("Smith"), and their three-year-old son. [Trial Transcript[2] ("Trial Tr.") at 192, 301-02, 920, 1147]. At 1:16 a.m. the next morning, the Petitioner made a 911 call, stating that Smith had been shot in the back of the head and was dead. [Trial Tr. at 1102, 1148, 1151- 52]. Officers responding to the call around 1:30 a.m. encountered the Petitioner as he walked out of his home, yelling, crying, and screaming. [Id. at 189, 193, 220, 241-42, 261-62, 271-72, 280]. The Petitioner "was covered in blood"—on his face, on his abdomen, on his hands, and on his back—and officers were unable to understand much of what he was saying. [Id. at 193, 219-20, 243, 255, 271]. Officer Manuel Watty testified that upon the officers' arrival at the home, the Petitioner reported that Smith "had shot at him and he tried to get the gun away from her and it went off." [Id. at 218].

After securing the Petitioner, officers from the Cherokee Police Department went inside the Petitioner's home, where they saw Smith's body, clothed only in her panties, a bra, and socks, one of which was rolled down off of her heel, lying face-up on the floor. [Trial Tr. at 191, 202]. Smith had blood on and around her head, on the front of her body, and on her back. [Id. at 191, 282]. John Peterson, one of the paramedics who arrived on the

[2] The transcript of the Petitioner's jury trial is filed in Criminal Case No. 2:10-cr-00009-MR as Documents 106 through 112.

scene, saw a large amount of blood under the back of Smith's head, where she suffered a gunshot wound that was "obvious[ly]" an injury that was "not survivable." [Id. at 282, 283]. Smith's skin was "mottled," indicating that "the blood had had time to pull away from her skin and pool in other parts of her body or bleed out completely," and her "skin was . . . white and pasty." [Id. at 283]. In addition to the blood under Smith's head, there was also "a lot of blood around [her] torso" and on the floor, [id.], and, based on "[s]wirl marks in the blood that were somewhat dry," [id. at 296], it appeared as though "it had been cleaned up," [id. at 283]. A .38 caliber revolver was found under Smith's left leg, and a single oxycodone pill, in a plastic baggie, was located near her right armpit. [Id. at 208, 413].

On the seat of a sofa immediately beside Smith's body, officers found a double-barreled shotgun with what appeared to be a fresh crack in the wooden stock. [Trial Tr. at 201, 209, 369, 395, 559-60]. When an agent attempted to open the shotgun to clear it of any ammunition, a five-inch piece of wood from the stock broke off. [Id. at 396-97]. Agents also found blood on the door frame and doorknob leading into the house, blood on the deck leading into the home, and blood on a set of keys in front of the entertainment center in the living room. [Id. at 401-02, 409]. In the driveway connected to Petitioner's home and "jammed up underneath . . . the front end of a car,"

agents found a travel bag with a partially torn strap, containing clothing and make-up belonging to Smith. [Id. at 437-41].[3]

Upon examination of Smith's body, the paramedics and officers found a single gunshot wound on the back of her head, near her neck and to the left of center. [Trial Tr. at 282, 394]. A firearms expert testified that Smith was shot by a revolver, and that at the time of the shot, the muzzle of the revolver was between five and fifteen centimeters from Smith's skin. [Id. at 686, 705-06]. Gunshot residue tests indicated that both Smith and the Petitioner were either in close proximity to a gun being fired or had handled the firearm. [Id. at 724].

Dr. John Davis, the pathologist who conducted Smith's autopsy, testified that because Smith's heart stopped beating immediately, any blood would have drained out only by gravity, not through any spurting or pumping. [Trial Tr. at 641-42, 679]. Dr. Davis testified that someone attempting to

---

[3] In the hours, days, and months following Smith's death, the Petitioner gave officers and others several conflicting versions of what had happened. For example, the Petitioner initially told officers that he had tried to take a pill from Smith and that when he did so, Smith seized his .38 revolver and started shooting at him. See United States v. Lespier, 725 F.3d 437, 441-42 (4th Cir. 2013) (recounting trial testimony). In subsequent statements, the Petitioner admitted to struggling with Smith and that at some point during their struggle, while Smith was still holding the gun, it discharged. Id. at 442. The Petitioner later admitted, however, that he grabbed the gun shortly before it discharged. Id. at 443. The Petitioner also gave conflicting statements about striking Smith. Id. at 442-43. Significantly, the Petitioner could never explain the angle from which Smith was shot or how that was consistent with his explanation of the events.

perform CPR on Smith would not have become covered with blood—as the Petitioner was—explaining that there was no source of bleeding on the front of her body.  [Id. at 642-43].

Dr. Davis calculated that the bullet that killed Smith was shot from behind her head, traveling in a slightly left to right angle (10 degrees) and in a slightly upward angle (30 degrees).  [Trial Tr. at 632, 665-66].  In addition to the gunshot wound, Smith had what appeared to be fresh abrasions caused by linear abrasive material on the inside of her right forearm, and a "significant localized hematoma" on the top of her head that extended to the surface of her skull.  [Id. at 394, 618-19, 628].  Dr. Davis opined that the strap of the travel bag found underneath the car in the driveway could have caused the abrasions on the inside of Smith's arm, and that the hematoma on Smith's head was fresh and had been caused by something flat, as opposed to something sharp, but not by falling on the floor.  [Id. at 622, 628].  Although no fingerprints were found on the pistol, examiners found the Petitioner's fingerprint on the shotgun stock.  [Id. at 444-45].  Smith's DNA was found in a blood stain on the revolver.  [Id. at 447, 553].

## B.    Trial Proceedings

On June 1, 2010, the Petitioner was charged in a Bill of Indictment with second-degree murder, in violation of 18 U.S.C. §§ 1111 and 1153 (Count

One), and with the use of a firearm during and in relation to a crime of violence, namely murder, in violation of 18 U.S.C. § 924(c)(1)(A)(iii) and (j)(1) (Count Two). [CR Doc. 5: Bill of Indictment]. Fredilyn Sison of the Federal Defenders of Western North Carolina was appointed to represent the Petitioner.

On November 3, 2010, the parties filed a signed Plea Agreement, pursuant to which the Petitioner agreed to plead guilty to Count One and the Government agreed to dismiss Count Two at the appropriate time. [CR Doc. 13: Plea Agreement]. A Rule 11 hearing was scheduled to take place on November 10, 2010. At that time, however, Ms. Sison appeared with the Petitioner and advised the Magistrate Judge that the Petitioner's family had retained attorney Russell McLean to take over the case. Ms. Sison therefore asked that the Magistrate Judge "strike the Rule 11 hearing from the calendar." [CR Doc. 134 at 3: Rule 11 Transcript]. Mr. McLean confirmed that he and attorney Brad Ferguson had been retained to represent the Petitioner. [Id. at 5]. Mr. McLean further indicated that upon finalizing the fee agreement with the Petitioner's family, he would be filing a general notice of appearance and a motion to continue the trial. [Id. at 4-5]. In light of these developments, the Magistrate Judge continued the Rule 11 hearing. [Id. at 6].

On November 19, 2010, the parties appeared before the Magistrate Judge for a status hearing. Noting that Mr. McLean and Mr. Ferguson had filed notices of appearance, the Magistrate Judge granted Ms. Sison's motion to withdraw. [CR Doc. 135 at 4: Status Hearing Transcript]. Mr. McLean then advised the Magistrate Judge that the Petitioner "desire[d] to withdraw his plea proposal" and proceed to trial. [Id. at 4-5].

On December 7, 2010, the grand jury returned a Superseding Bill of Indictment, charging the Petitioner with first-degree murder, in violation of 18 U.S.C. §§ 1111 and 1153, and with the use of a firearm during and in relation to a crime of violence, namely murder, in violation of 18 U.S.C. §§ 924(c)(1)(A)(iii) and 924(j)(1). [CR Doc. 20: Superseding Bill of Indictment]. Significantly, although the Petitioner had withdrawn his assent to the Plea Agreement and was now charged with a more serious offense, the Government's previous plea offer of a plea to second-degree murder and dismissal of the § 924(c) count remained on the table and was never rescinded. [Civil Case No. 1:15-cv-00007-MR, Doc. 14 at 103].

The case proceeded to a jury trial beginning on May 31, 2011. On June 8, 2011, the jury found the Petitioner guilty of both first-degree murder and using a firearm during and in relation to a murder. [CR Doc. 86: Verdict]. The Court sentenced the Petitioner to a term of life imprisonment as to the

first-degree murder offense and to a consecutive term of life imprisonment as to the firearm offense.  [CR Doc. 99: Judgment].

The Petitioner appealed, and the Fourth Circuit affirmed this Court's judgment.  United States v. Lespier, 725 F.3d 437, 447-49 (4th Cir. 2013). The Supreme Court denied the Petitioner's request for a writ of certiorari on January 13, 2014.  Lespier v. United States, 134 S. Ct. 974 (2014).

## C.    Post-Conviction Proceedings

On January 12, 2015, the Petitioner, through attorney David Belser, filed a motion to vacate pursuant to 28 U.S.C. § 2255, raising a number of ineffective assistance of counsel claims.  [Civil Case No. 1:15-cv-00007-MR, Doc. 1].  The Court conducted an evidentiary hearing on the Petitioner's § 2255 motion on October 23, 2015.  On June 17, 2016, the Court entered an Order granting the Petitioner's Motion to Vacate, concluding that trial counsel had been ineffective in advising the Petitioner regarding the withdrawal of his assent to the Plea Agreement and in failing to convey a formal plea offer from the Government.  [Civil Case No. 1:15-cv-00007-MR, Doc. 21].  The Court therefore ordered the Government to reoffer the plea proposal to the Petitioner.  [Id.].

In July of 2016, the Petitioner—who was still represented by attorney Belser—entered into a written Plea Agreement with the Government,

agreeing to plead guilty to the lesser included offense of second-degree murder, in exchange for the Government's agreement to dismiss Count Two of the Superseding Bill of Indictment. [CR Docs. 20, 138]. In this Agreement, the Petitioner agreed that "either party [could] seek a departure or variance from the 'applicable guideline range.'" [CR Doc. 138 at 2 ¶ 7a]. The Petitioner also agreed that "in exchange for the concessions made by the United States," he would waive his right to contest his conviction and/or sentence through a post-conviction proceeding except on the grounds of ineffective assistance of counsel or prosecutorial misconduct. [Id. at 4 ¶ 19].

In September of 2016, between the signing of the Plea Agreement and the Rule 11 proceeding, the Petitioner engaged in several telephone conversations with friends or family from jail. These conversations were recorded per jail policy. In these conversations, the Petitioner expressed his frustration that he was in a "have-to situation," requiring that he tell this Court that he was guilty of second-degree murder. [See CR Doc. 156 at 2, 4-5]. The Petitioner said during one call that "it suck[ed]," but he had to admit his guilt because "there might not be another chance after this to give me an out date." [Id. at 2, 3]. The Petitioner expressed concern during another call that his admission of guilt might affect this Court's sentencing decision, given his earlier testimony that he was not guilty. [Id. at 3 ("I just don't want it to affect

him . . . , if I have to say 'yeah' and I don't really have to.")].  In a third call, made less than a week before his Rule 11 hearing, the Petitioner stated that he was "going to try not to say [he was guilty] sarcastically."  [Id.].

On September 22, 2016, this Court conducted a hearing under Federal Rule of Criminal Procedure 11.  At this hearing, the Petitioner affirmed that he understood the second-degree murder charge to which he was pleading guilty and that he faced a maximum sentence of life in prison for that offense.  [CR Doc. 170 at 7-9].  The Petitioner also affirmed that he understood that if he did not plead guilty in accordance with the Plea Agreement, he was subject to this Court's earlier Judgment, which had sentenced the Petitioner to life in prison.  [Id. at 9-10].

The Petitioner affirmed that he had discussed the Sentencing Guidelines with his attorney and understood how they might apply to him but that he also understood that the Court could sentence him to a term above or below the range advised by the Sentencing Guidelines.  [CR Doc. 170 at 11-12].  The Petitioner further affirmed that he understood that if his sentence was "more severe than [he] expect[ed] that [he] would still be bound by [his] plea and have no right to withdraw [it]."  [Id. at 12].  The Petitioner affirmed that he understood "that by entering [the] plea of guilty there [would] be no new trial" and that he was "in fact guilty of the lesser included offense of

10

Second Degree Murder." [Id. at 13]. The Petitioner further stated that he agreed with the terms of his Plea Agreement and that he "knowingly and willfully" waived his right to contest his conviction or sentence in a post-conviction proceeding except for claims of ineffective assistance of counsel or prosecutorial misconduct. [Id. at 16-17]. At the conclusion of the hearing, this Court found that the Petitioner's guilty plea was "knowingly and voluntarily made." [Id. at 18].

The probation office prepared a supplement to the Petitioner's Presentence Report ("PSR"), calculating a total offense level ("TOL") of 40 and a criminal history category ("CHC") of I and recommending an advisory Guidelines range of 292 to 365 months' imprisonment. [CR Doc. 152 at 2]. The total offense level included a two-offense-level increase because the Petitioner committed perjury during the evidentiary hearing on his first Motion to Vacate, when he denied that he had murdered Smith. [Id.]. The probation officer also declined to recommend a two-offense-level reduction for acceptance of responsibility. [Id.].

This Court conducted the Petitioner's sentencing hearing on January 27, 2017. [CR Doc. 171]. At the hearing, the Petitioner objected to the perjury enhancement and the denial of a two-level reduction for acceptance of responsibility. [Id. at 6, 23]. This Court sustained both objections, finding

in part that the Petitioner's denial of culpability during the evidentiary hearing was against his interest and not material to the proceeding.  [Id. at 26-27]. Based on those rulings, the Court calculated a TOL of 36, which along with a CHC of I resulted in an advisory Guidelines range of 188 to 235 months' imprisonment.  [Id. at 28].

After hearing extensive argument from both parties concerning the sentence that the Court should impose, this Court sentenced the Petitioner to 348 months' imprisonment.  [CR Doc. 171 at 79].  Addressing the nature and circumstances of the offense, the Court found that Smith's murder involved "the intent to kill with malice aforethought with some substantially aggravating circumstances."  [Id. at 74-75].  The Court found that the Petitioner's history of domestic violence perpetrated against Smith and the presence of the parties' young son during the murder were aggravating circumstances.  [Id. at 76-77].  The Court also found that "the evidence presented . . . at the evidentiary hearing . . . and also shown in the calls that [the Petitioner] made in the days right before the plea hearing" showed that "his remorse is less than complete."  [Id. at 77].  The Court found further that the Petitioner's threat to kill FBI Special Agent Randy Cosby, which was

described in the original PSR, was also an aggravating factor.[4]  [Id. at 77-78]. The Court concluded that based on the seriousness of the offense and the Petitioner's history and characteristics—which included a history of domestic violence and a criminal history that underrepresented that history— a sentence of 348 months' imprisonment was warranted.  [Id. at 78-79].

The Petitioner appealed, arguing that, in determining his sentence, this Court erred by considering evidence that would not have been before the Court but for the ineffective assistance of his trial counsel.  The Petitioner further argued that the Government improperly used evidence at sentencing that would not have been developed without the ineffective assistance of the Petitioner's prior counsel.  United States v. Lespier, No. 17-4084, Doc. 22. The Fourth Circuit granted the Government's motion to dismiss the Petitioner's appeal, holding that the issues that the Petitioner sought to raise on appeal fell squarely within the scope of his appellate waiver.  Id., Doc. 42. The Petitioner filed a petition for writ of certiorari, and the Supreme Court denied the petition on March 19, 2018.  Id., Doc. 49.

---

[4] Following the Petitioner's arrest, and while he was being detained in a local jail facility, the Petitioner told his cellmate of his intent to kill FBI Special Agent Cosby in the courtroom following his conviction, and that he intended to kill himself if convicted.  [CR Doc. 92 at 8 ¶ 31].

The Petitioner filed the present Motion to Vacate on March 15, 2019. [CV Doc. 1].  The Government has filed a response in opposition and moves to dismiss the Petitioner's Motion.  [CV Doc. 5].

## II.   STANDARD OF REVIEW

Pursuant to Rule 4(b) of the Rules Governing Section 2255 Proceedings, sentencing courts are directed to promptly examine motions to vacate, along with "any attached exhibits and the record of prior proceedings" in order to determine whether a petitioner is entitled to any relief.  After having considered the record in this matter, the Court finds that this matter can be resolved without an evidentiary hearing.  See Raines v. United States, 423 F.2d 526, 529 (4th Cir. 1970).

## III.  DISCUSSION

### A.   Ineffective Assistance of Counsel Standard

The Sixth Amendment to the United States Constitution guarantees criminal defendants the right to effective assistance of counsel.  See U.S. CONST. art. VI.  In order to challenge a conviction based on the ineffective assistance of counsel, a petitioner has the burden of establishing that: (1) defense counsel's performance was deficient, in that counsel's "representation fell below an objective standard of reasonableness" as measured by "prevailing professional norms," and (2) the petitioner was

prejudiced thereby, meaning "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland v. Washington, 466 U.S. 668, 688, 694 (1984).

To establish deficient performance by counsel, a petitioner must overcome the "strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689. As the Strickland Court cautioned:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.

Id. at 689 (citation omitted). In the end, to prevail on a claim of ineffective assistance, a petitioner has the burden of showing "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Harrington v. Richter, 562 U.S. 86, 104 (2011) (quoting Strickland, 466 U.S. at 687).

In considering the prejudice prong, the Court can grant relief under Strickland only "if the 'result of the proceeding was fundamentally unfair or unreliable.'" Sexton v. French, 163 F.3d 874, 882 (4th Cir. 1998) (quoting Lockhart v. Fretwell, 506 U.S. 364, 369 (1993)). To that end, a petitioner "bears the burden of affirmatively proving prejudice." Bowie v. Branker, 512 F.3d 112, 120 (4th Cir. 2008). Moreover, the likelihood of a different result must be "substantial, not just conceivable." Richter, 562 U.S. at 112.

## B. Petitioner's Claims of Ineffective Assistance of Counsel

### 1. Improper advice related to consequences of guilty plea

The Petitioner asserts that his attorney throughout the first § 2255 proceedings, David Belser, improperly advised him that he "could not exercise his right to a jury trial after [his] conviction and sentence [were] vacated." [CV Doc. 1 at 5]. He also asserts that Belser improperly failed to research legal issues "that could be raised . . . at trial" and that counsel improperly failed to interview potential witnesses and witnesses who testified during the Petitioner's trial "before advising [the Petitioner] to take the plea offer." [Id. at 6]. The Petitioner further argues that Belser did not know enough about the consequences of a successful effort to vacate a jury's verdict because of ineffective assistance of counsel related to a rejected plea

offer, leading him to improperly advise the Petitioner that he could not receive a new trial. [Id. at 11-12].

Underlying all these arguments is the erroneous assumption that had the Petitioner rejected the plea offer that the Government was required to reoffer, he would have been entitled to a new jury trial. The Supreme Court, however, has made clear that a defendant who successfully argues that he rejected a plea offer because of ineffective assistance of counsel is not entitled to a new trial. Lafler v. Cooper, 566 U.S. 156, 170-71 (2012). Instead, he is entitled to have the Government reoffer the original plea offer, and he can choose to accept that plea offer, or not. If he accepts the plea, the district court has the duty to fashion a sentence that, without requiring the court to disregard information about the defendant's crime that was discovered after the original plea offer was made, results in a fair sentence. Id. at 171-72.

Here, the Petitioner has not shown that Belser provided constitutionally deficient representation by failing to consider legal issues or develop evidence that might be presented at a second trial, because the Petitioner was *not entitled to a new trial*. The Petitioner received precisely the relief that Lafler contemplates: the Government reoffered its original plea to second-degree murder, and the Petitioner received a sentence well below

the two consecutive life terms he received based on his conviction of first-degree murder.  Belser did not improperly fail to consider possible strategies for a new trial, because <u>Lafler</u> does not authorize a new trial in these circumstances.

Even if Belser's representation in this regard were somehow deficient, the Petitioner has not shown any prejudice from Belser's performance.  The Petitioner received two consecutive life sentences following his trial and now has a determinate sentence that will result in his release once he has served his time.  The Petitioner never faced the possibility of a better result through a new trial, and he has not shown a reasonable probability of a different result had his post-conviction counsel advised him to reject the renewed plea offer.  In fact, had he rejected that advice, he would still be serving two life sentences.  For all these reasons, the Petitioner's claims of ineffective assistance related to the advice given by counsel related to the consequences of a guilty plea are denied and dismissed.

## 2. Improper advice related to recorded telephone conversations from jail

Next, the Petitioner asserts that Belser improperly coerced him into accepting the Government's renewed plea offer.  [CV Doc. 1 at 5].  He also asserts that Belser improperly advised the Petitioner to consult with his

family, but failed to advise the Petitioner that conversations with his family from jail could be construed as obstructive and used against him by the prosecution. [Id.]. The Petitioner also asserts that Belser improperly failed to challenge this Court's consideration of those conversations in determining the Petitioner's sentence. [Id.].

While the Petitioner contends that he was coerced into accepting the Government's renewed plea offer, he fails to offer any evidence in support of that claim. Further, Belser's advice to the Petitioner to consult with his family was reasonable and appropriate, particularly if the Petitioner was inclined to reject a renewed plea that gave him the possibility of one day leaving prison—a possibility that did not exist if he rejected the renewed plea offer. As for Belser's failure to warn the Petitioner that his telephone conversations with his family might be used against him, this omission does not constitute deficient performance. Notably, the Petitioner does not claim that he did not know his conversations were being recorded. As such, he should have known without being told that such conversations could be used against him.

The Petitioner also has not shown that Belser improperly failed to challenge this Court's consideration of these jail call recordings in determining the appropriate sentence. Section 6A1.3(a) of the Sentencing

Guidelines provides that "[i]n resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy."  U.S.S.G. § 6A1.3(a).  The Petitioner's counsel stipulated at his sentencing hearing that the transcripts of the jail calls were accurate [CR Doc. 171 at 7-8], and the Petitioner fails to identify any other basis upon which this Court should have excluded such calls.

Moreover, the Petitioner has not shown a reasonable probability of a different result had Belser advised him that his telephone calls with his family from jail could be used against him. In deciding to sentence the Petitioner to a term of 348 months, the Court relied on numerous factors, only one of which was that the Petitioner's remorse was "less than complete."  [CR Doc. 71 at 77].  Notably, however, the Court found the Petitioner's lack of complete remorse based not only on the recorded jail calls, but also on the Petitioner testimony during the § 2255 evidentiary hearing in which he denied responsibility for Smith's murder.

As the Petitioner has failed to show either deficient representation or prejudice with respect to Belser's performance with respect to the recorded jail calls, this claim must also be denied and dismissed.

### 3. Failure to challenge the content of the plea offer

Next, the Petitioner argues that the Government reneged on critical parts of the Plea Agreement with the Petitioner by "increasing [his] actual punishment/sentence," and that Belser improperly failed to object to this alleged breach of the Plea Agreement by the Government. [CV Doc. 1 at 6].

The Petitioner fails to identify any particular breach of the parties' Plea Agreement. The Court directed the Government to reoffer the Petitioner the Plea Agreement that the Petitioner had rejected through the improper advice of trial counsel, and the Government complied with this directive. That Plea Agreement authorized either party to "seek a departure or variance from the 'applicable guideline range.'" [CR Doc. 138 at 2]. At the sentencing hearing, the Government sought an upward variance from the applicable Sentencing Guidelines' range, as the Plea Agreement explicitly authorized. The Government did not in any way violate the parties' agreement by seeking an upward variance. Accordingly, Belser counsel did not provide deficient representation in failing to assert that the Government had breached the parties' Plea Agreement.

### 4. Post-conviction counsel's sentencing advocacy

The Petitioner argues that Belser improperly failed to anticipate the Government's arguments regarding the appropriate sentence to be imposed and failed to object to the Government's supposedly vindictive efforts to have the Court impose a sentence higher than the 14 to 18 years the Petitioner contends he would have received had he not withdrawn from the parties' original Plea Agreement. [CV Doc. 1 at 6-7]. The Petitioner also alleges that Belser improperly failed to object to the offense-level enhancements and other portions of the PSR that were used to increase his sentence. [Id. at 8]. Finally, the Petitioner argues that Belser failed to present any mitigation evidence, including evidence of the Petitioner's post-imprisonment rehabilitation. [Id. at 8-9].

The Petitioner has not alleged facts supporting either deficient representation by Belser or any prejudice with respect to any of these claims. First, while the Petitioner argues that under the original Plea Agreement, he would have received a sentence of between 14 and 18 years, that Agreement did not contain any stipulation or joint recommendation to that effect. Moreover, the Petitioner acknowledged during his plea colloquy that he understood that his sentence could be higher than the range advised by the Sentencing Guidelines. As for the offense-level enhancements, contrary

to the Petitioner's argument, Belser did in fact make such objections.  In fact, he successfully objected to an offense-level increase based on obstruction of justice and successfully argued in favor of an offense-level decrease for acceptance of responsibility. The Court did not apply any other offense-level enhancements.

Belser argued for leniency for the Petitioner, emphasizing the many letters of support provided by members of the Cherokee community.  Belser asked this Court to sentence Lespier at the bottom of his Guidelines range, which would have been between 15 and 16 years, so that Lespier would not be punished for his decision to go to trial.  Further, the supplemental PSR noted the educational classes that the Petitioner had completed during his imprisonment.  The Petitioner does not identify any other mitigating evidence or legal argument that Belser could have presented that was not already before the Court.

The Petitioner further has not shown a reasonable probability of a more favorable result if Belser had made different arguments.  Belser successfully argued for a Guidelines range four levels lower than the range calculated by the probation office and advocated by the Government.  The Petitioner has not identified anything that Belser could have argued or introduced that would have been reasonably likely to result in a lower sentence.

### 5. Failure to advise Lespier about scope of appeal waiver

The Petitioner next argues that Belser failed to explain to him that he was waiving his right to appeal his sentence.[5] [CV Doc. 1 at 8].

During the Rule 11 proceeding, this Court advised the Petitioner that he was waiving his right to appeal or to seek post-conviction relief, except on the bases of ineffective assistance of counsel or prosecutorial misconduct. The Petitioner affirmed that he understood the scope of that waiver. Thus, even if Belser had not advised him properly, this Court properly advised him of the consequence of the appellate waiver. In any event, the Petitioner has not shown a reasonable probability that had he understood that he could not appeal his sentence, he would have declined the Government's offer to plead guilty to second-degree murder and receive the possibility of a sentence of less than life in prison. This claim, therefore, is without merit.

---

[5] In conjunction with this claim, the Petitioner also appears to argue that the appellate waiver precluded the presentation of ineffective assistance of counsel on appeal or during post-conviction proceedings. [CV Doc. 1 at 8]. This, however, is inaccurate. The appellate waiver clearly exempts ineffective assistance claims from the scope of the waiver. If the Petitioner asserted a meritorious claim of ineffective assistance, the appellate waiver would not preclude him from asserting such a claim in this proceeding.

### 6. Failure to object to inadequacy of plea colloquy

The Petitioner next argues that Belser provided deficient representation by failing to object to the inadequacy of the plea colloquy. [CV Doc. 1 at 9].

The Petitioner does not specify how he believes the plea colloquy was inadequate. Regardless, the Court's plea colloquy complied in every respect with the requirements of Rule 11. Therefore, his claim of deficient representation in this regard fails. Moreover, the Petitioner has not shown a reasonable probability that had he been advised differently in the Rule 11 hearing, he would have declined to plead guilty and received a more favorable result. This claim, therefore, is also without merit.

### 7. Failure to object to application of § 3553(a) factors

The Petitioner next argues that Belser improperly failed to object to the Court's application of the sentencing considerations of 18 U.S.C. § 3553(a) or the Court's failure to address his arguments in mitigation. [CV Doc. 1 at 9-10].

Contrary to the Petitioner's argument, the Court appropriately analyzed the § 3553(a) sentencing factors in fashioning the Petitioner's 348-month sentence. In particular, the Court relied on the nature and circumstances of the offense, including specific aggravating factors. The Court also

considered Belser's argument that the Petitioner should not be punished for going to trial. In so doing, the Court attempted to strike a balance, as required by <u>Lafler</u>, between not ignoring the information learned during the trial but also sentencing the Petitioner to a fair sentence that did not punish him for the ineffective assistance of counsel he had received earlier. <u>Lafler</u>, 566 U.S. at 171-72. The Petitioner has not shown that Belser provided deficient representation in failing to object to the Court's analysis, nor has he shown that had Belser objected, there is a reasonable probability that this Court would have imposed a lower sentence. Accordingly, this claim fails.

### 8. Failure to request mental-health evaluation

Next, the Petitioner argues that Belser improperly failed to request a mental health evaluation. [CV Doc. 1 at 10].

There is no evidence in the record, however, that the Petitioner suffers from a mental-health condition that might have rendered him incompetent to assist in his own defense or that his counsel should have been aware of such a condition. The Petitioner also has not shown a reasonable probability that had he been evaluated for competency, that evaluation would have resulted in a lower sentence than the sentence he received. Accordingly, this claim must be dismissed.

### 9. Failure to object to lack of notice of upward variance

The Petitioner also argues that Belser improperly failed to object to the Court's imposition of an upward variance sentence without providing advance notice to the Petitioner. [CV Doc. 1 at 10-11].

Contrary to the Petitioner's argument, the Court was not required to provide advance notice of its intent to impose an upward variance sentence. A district court must provide advance notice of its intent to depart on a basis not contemplated by the presentence report or the parties. Fed. R. Crim. P. 32(h). This rule, however, "does not apply to 18 U.S.C. § 3553 variances." Irizarry v. United States, 553 U.S. 708, 714 (2008). Here, the Court did not depart from the Guidelines. Therefore, no advance notice was required and Belser did not improperly fail to object to the lack of advance notice of this Court's intention to vary upwardly.

### 10. Improper appellate advocacy

In his last set of claims, the Petitioner that his appellate counsel improperly failed to resist the enforcement of his appeal waiver, improperly failed to challenge a sentence that is plainly unreasonable, improperly failed to argue issues under the plain-error rule, and improperly failed to argue that his sentence was the result of vindictiveness. [CV Doc. 1 at 13].

The Petitioner has not identified any legal argument that he did not waive that was likely to succeed on appeal. The Petitioner waived his right to appeal his sentence and has not identified any legal argument that his counsel could have made against the enforceability of that appeal waiver, let alone a meritorious argument.

The Petitioner did not waive his appellate rights without consideration. The Petitioner waived his right to appeal in exchange for the opportunity to plead guilty to second-degree murder and the possibility of a sentence of less than life in prison. The Court found that this waiver was made knowingly and voluntarily. The Petitioner has not identified any deficient representation by his appellate counsel or shown a reasonable probability of a different result. Accordingly, these claims are also denied and dismissed.

## IV.   CONCLUSION

For the foregoing reasons, the Government's Motion to Dismiss is granted, and the Petitioner's Motion to Vacate is denied and dismissed.

The Court further finds that Petitioner has not made a substantial showing of a denial of a constitutional right. <u>See generally</u> 28 U.S.C. § 2253(c)(2); <u>see also</u> <u>Miller El v. Cockrell</u>, 537 U.S. 322, 336 38 (2003) (in order to satisfy § 2253(c), a "petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims

debatable or wrong") (citing <u>Slack v. McDaniel</u>, 529 U.S. 473, 484-85 (2000)).  The Petitioner has failed to demonstrate both that this Court's dispositive procedural rulings are debatable, and that the motion to vacate states a debatable claim of the denial of a constitutional right.  <u>Slack v. McDaniel</u>, 529 U.S. 473, 484-85 (2000).  As a result, the Court declines to issue a certificate of appealability.  <u>See</u> Rule 11(a), Rules Governing Section 2255 Proceedings for the United States District Courts, 28 U.S.C. § 2255.

## O R D E R

**IT IS, THEREFORE, ORDERED** that the Government's Motion to Dismiss [CV Doc. 5] is **GRANTED**, and the Petitioner's Motion to Vacate Conviction and Sentence Pursuant to 28 U.S.C. § 2255 [CV Doc. 1] is **DENIED** and **DISMISSED**.

**IT IS FURTHER ORDERED** that the Court declines to issue a certificate of appealability.

**IT IS SO ORDERED.**

Signed: March 30, 2020

Martin Reidinger
United States District Judge

29